23-1280-1323-1324 Energy Michigan Inc. et al. v. Michigan Public Service Commission et al. Oral argument, 15 minutes for plaintiffs, 15 minutes to be shared by defendants, and an intervener. Mr. Larson for the appellant, Carl Sopolis. And then your colleague will do the rebuttal? That's correct, Your Honor, and we're arguing jointly, but he'll handle that for five minutes. Well, good afternoon, Your Honors, and may it please the Court. Zach Larson on behalf of Plaintiff Abate. When a state conditions the retail sale of goods within its borders on the location where a good has been manufactured, that is discrimination under the Commerce Clause. That has been true for milk, for solid waste, for coal, and for alcohol. It is equally true for electricity. Likewise, when states erect barriers to importing or exporting a good among states, such laws are discriminatory, and the Supreme Court has struck down restrictions on exporting electric power. Here, Michigan's individual local clearing requirement mandates that any load-serving entity must obtain, either through purchase or generation, a certain percentage of electricity within a zone that is located wholly inside of Michigan. That is discrimination. Is it your contention that the regulators here have no interest in where the power comes from? That's not our contention. We would say, yes, they certainly have an interest in reliability as an abstract matter. But to the point that we get to strict scrutiny and the question of whether or not they've met that and demonstrated that they have a legitimate local interest and that it's narrowly tailored, then the problem is really mostly the narrow tailoring. It's the question of the fact that the state must demonstrate not just that they have an interest and they're meeting an interest, but that there are no other nondiscriminatory alternatives and that this is the least discriminatory alternative that they could possibly choose. And it's impossible for the state to meet that when what they've chosen in this particular instance is this incremental need methodology that divorces the determination of need. The part that you're talking about now, this is basically the part that went to trial. Is that fair? That's correct. So putting that to one side, then the part that the court decided before trial on what I would call the Tracy issue, would it be fair to say conceptually and amplify that your position is electricity is electricity and their position is that, no, we are a utility. We have to serve every customer, and these folks don't have to serve every customer, so we have different obligations, so not every electron is the same as every other electron. Is that kind of fair statement or amplify the two sides? I think it's relatively fair, but I think that what our position is on Tracy is effectively that Tracy requires constitutional comparison. It requires that you ensure that the Commerce Clause has work to do. That is the language of Tracy. It must have a job to do. And so you must, in fact, be able to say that you are comparing things, that if you were to remove the discriminatory act of the state, that, in fact, it would increase competition among the several states, so that it, in fact, affects interstate commerce. So our position is not only do you have that, you have a clear case where AESs and incumbent utilities are currently in competition with each other. They're not in competition for everything, right? They're in competition largely for these large industrial and retail, large retail customers. We would respectfully disagree with that characterization, Judge Boggs, and we would say that they are in competition for everything. There is not a captive market like there was in Tracy. There's, in fact, you know, there's a cap on how much of the market they can capture, but that's a difference than what in Tracy was taking place. But do you ever serve or have any obligation to serve the people at 328, 18th Street, 326, 324, 322, which they do have an obligation? We can compete for that business, but we are not, you know, obliged as the provider of last resort. But the fact of the matter is, Judge Boggs, that, you know, there's a cap at 10%, but nonetheless, we're competing for everybody, right? We're competing for everybody up to that cap. The cap is simply saying, after that, we're not going to allow you to serve anybody. If you're serving, if you were to serve those folks at 328, 18th Street, you'd be doing it over the wires of the other folks, though, would you not? Well, what we would be charging them, what the AESs would be charging them, is the AESs would be charging them a power supply cost. That is the same as what is charged by utilities. There is then a separate cost of the transmission and the local distribution charges. But, yes, I mean, it would be paid. You know, each person is supplying power, and that is the fundamental comparison, is the power supply that is being provided, the electric energy, and that is the watt-to-watt comparison. So the fact that there may be other costs associated with that is really not relevant from the standpoint of the Constitution. But if I may move back to the question of strict scrutiny, because I want to make sure that the court understands this, what the state has effectively done here is the state has mandated not just a four-year forward process, which we're fine with, that's a non-geographical distinction, but it is effectively mandated prophylactically that you must have under contract your electric capacity and demonstrate that four years in advance before everybody shows their cards and we determine whether or not the amount of capacity or how the amount of capacity under contract compares to the actual need. So in these capacity demonstration processes, we're looking at what do we project is the need from a standpoint of load, and then what is under contract. So the state has typically historically done that on one-year periods. Now it's doing that on a four-year period. That's fine. That increases reliability without discrimination. That's one of the alternatives that we have said is perfectly acceptable. But what they're doing here is they're saying before we've determined that there's a shortfall, before there's actually a need as based on, as strict scrutiny requires, concrete record evidence, a demonstrated actual need, we're going to require you to go out there and get your contracts, put generation in place, et cetera. What is the relation between what you just said before a need is demonstrated, between what the commission is doing and what MISO and the national liability are doing? Yeah. MISO has its own requirements, which are different from Michigan's. It does. And what it's doing is it's looking at it at a zonal level or at the aggregate. So in terms of, you know, and this goes to the point that we've made. Those zones largely follow state lines, don't they? That's correct. But this goes to the point that we've made about the nondiscriminatory nature versus the discriminatory nature and also the narrow tailoring point. So, you know, we wouldn't dispute that there are some capacity import limitations. There's physical restraints on the grid. But the state of Michigan has divorced its calculation of need from those actual physical restraints. It's saying we're going to start, we're going to calculate need by projected load minus what, or projected load and then compare it to what was in service in April of 2017 and subtracting out anything that retires from that point onward with. Past dated existing capacity minus retirements. So do they not take into account, of course, utilities as well as future projected additions are not always real. They're, but they're not. Some are, some aren't. They're not adding back in any of those future additions, right? So over time, that incremental need is increasing even if consumers takes a 100 megawatt plant, removes it from, removes it, you know, retires it and replaces it with another one that's in zone 7. All of a sudden we have a new 100 megawatt need even though it's still there and it's still being serviced. So that's the point that we've made about the fact that they, you know, it's clearly not narrowly tailored because it is ratcheting up. That discrepancy, let's call it, assuming you're correct, in principle doesn't it fall on both the utilities and the alternative people because you have to project in the same fashion, don't you? Well, if I understand your question, Judge Boggs, I think, you know, yes, it's being projected, but in terms of where it falls, you know, we've talked about alternatives in terms of how to allocate where it falls. Our narrowly tailored version, our narrowly tailored alternative that our expert talked about is, okay, let's project and we'll project four years in advance. Instead of prophylactically requiring that before we do the math and we compare the projection to what's in capacity, you know, what's in zone capacity, let's instead, after that projection, with four years to make any necessary changes, let's make a determination then of how to allocate a shortfall. So we'll do our projections on a four-year forward basis. If there's a shortfall, if there's a need, then we can allocate that appropriately. We can put that burden on, you know, whoever causes the shortfall, et cetera. That was an alternative that was proposed and that the court, in our view, you know, improperly suggested. Let me ask you one other thing. This is, as my understanding, has all been stayed. If we were to end up ruling in such a way that, indeed, Michigan could implement what it wants, what would that mean on the ground, you know, the day after? Would that mean that you would have to stop providing something you're already providing? Would it mean you'd have to cancel a contract? On the ground, it means that alternative electric suppliers are being chased out of the market. It means that anybody who doesn't have that under contract four years in advance is not going to be able to serve load within Michigan. So, you know, effectively, the status quo, and we've, you know, shown that, I think, you know, this goes to the point of whether or not there's a need, the status quo has been that Michigan does not believe as I was reading this, it was saying that you have to provide a certain amount of your, what you're selling in state. So I would have thought it would just mean that then you would need to come up, rather than having 100% coming from West Virginia. You'd have to, you know, do something to get X percentage within Michigan. Yeah. Is that wrong? Practically, you're either going to have to make substantial investments in $100 million projects that the AESs simply don't have the economies of scale in order to make those investments, or you have to come begging from consumers and ask them to sell it to you. The thought that you can't do it is that bad things will happen. It's that practically speaking, it's not possible, and I think all experts even agreed on that. I think that, you know, Mr. Sparks, the expert for consumers, said that the economies of scale are not there. You have to have the stability that the utilities have with a 90% guaranteed market share that AESs don't have. You simply cannot do that. So you're going to have to come asking for a contract from consumers, and it means that frankly they're just not going to be able to serve the market in Michigan. Should we be focusing on the challenges you face or should we be focusing on the fact that your suppliers are out of state and they're being harmed because they're not able to compete in the state of Michigan the same way that Michigan-based electricity producers are? I think that focusing on the discrimination answers then the question in large part because then it raises the issue of strict scrutiny, which is an incredibly high burden. You know, appellate courts have never upheld a made-in-state or process-in-state mandate like this one, and we don't think that the fact that this is a utility... Strict scrutiny, who has the burden? It is the state's burden, and we don't think that was appropriately allocated by the court. And I see my time is up, but I'm happy to answer further questions. Thank you. Thank you very much for your time. So we also have two advocates on the appellee side, and Mr. Sattler is going first. Thank you, Your Honor. I'll be splitting time with the Commissioner's Council, and I am counsel for Consumers Energy. May it please the Court. There was a lot of focus from a base counsel on strict scrutiny, but before we even get to strict scrutiny, we should be asking whether or not the law discriminated. And a law can be facially neutral, even if it draws geographic distinctions. The Court reached the same decision recently in Truesdale v. Friedlander. Sorry, what's the name? Truesdale v. Friedlander. Truesdale, okay, got it. In that case, the Court evaluated Kentucky's Certificate of Need statute for ambulance providers, and when considering whether out-of-state providers could be required to obtain certificates of need to provide intra-state service, the Court found that the statute was facially neutral because it imposed the same burdens and granted the same benefits to both in-state and out-of-state providers. And the Court also pointed out that a law can be facially neutral, even if it refers to state borders. Now, Chris. How about, so, I mean, this is a complicated case, and you drew one of the experts in this area, so we're fortunate to have Judge Boggs on the panel. But from my more modest perspective, if you're an out-of-state electricity producer, you have access to less of the Michigan market than an in-state producer, right, given this 2.3 percent requirement? Your Honor, the requirement would apply to both in-state electric providers and out-of-state suppliers. And Judge Lawson found that the law provides an incentive to both to create that or to locate power within Zone 7 that's so critical to the reliability of the system. But would you, I'm probably not following, but if you're an out-of-state electricity producer, you don't have access to the Michigan market the same way an in-state producer does. And at that base level, this just feels to me like something that Dormant Commerce Clause customarily addresses. Well, there is the 10 percent cap on choice, as Mr. Larson was discussing. Yeah, I'm not really focused on AES versus your client or DTE, but are we supposed to look at the impact on out-of-state energy electricity producers? Well, if we are talking about energy, that is a separate issue from the capacity requirement in this case. Energy is, there's no limit on how much energy the alternative electricity suppliers can bring into the state from out of the state to the extent that our transmission infrastructure allows it. I'm remembering 100 percent, right? They have to, 2.3 percent has to be from a Michigan manufacturer, a Michigan producer of electricity. Well, that's true when it comes to a capacity, which is the ability to produce energy. But if we're talking about energy, there's a separate market for energy, and to the extent that our transmission infrastructure allows energy to be imported in the state, there's no cap on how much energy. So are you, does that mean, just so we get this straight from the physics point of view, that if they had capacity sitting in Michigan, wind or solar or anything, and it's just sitting there, they would meet the requirement as long as it's reliably available, and then you could bring in all the energy that you wanted. Is that the point you're making? That's absolutely correct, Your Honor. And so let's talk about the sort of parade of horrible from their side, is they're saying that there's no way for them to get that in-state capacity. That's the way I heard it, that either your clients control it all, or it would just cost too much for them to do what I said. Okay, we're going to build a standby facility in Michigan, and it would just cost too much. I mean, A, is that the right way to think about their argument, and B, is it correct? Well, I would say, Your Honor, that there's very little evidence on the record as to how much in-state capacity alternative electric suppliers actually have. In the judge's pretrial order, the parties agreed that there is some, you know, alternative electric suppliers have some in-state capacity and import some capacity. Just like consumers' energy also goes to the market to import some of its capacity. So on the record, we don't know how much in-state capacity the alternative electric suppliers possess, and this really goes to the burden question under the… Under strict scrutiny? Not under strict scrutiny, Your Honor, but under the discriminatory effect argument. The plaintiffs have an obligation to show a burden from the local cleaning requirement and also to show how that burden… Can they show that the burden party is the out-of-state electricity producers? That gets to the heart of it, right? Whether or not out-of-state electric providers are being discriminated against. None of them are in the litigation, are they, or are they? Does that matter? Is there some facility in West Virginia that's one of the plaintiffs? Well, the alternative electric suppliers, ASs, are represented, and they do. They're the entities taking advantage of the market to import power into the state from outside of the state. So, yes, it's… Well, just help me then. Maybe I was misreading part of it. I had the feeling that these folks were, I mean, not the buyers, but the AESs were essentially brokers, that they don't own the power plants in West Virginia. Am I wrong? They own some, and they go to the market for some. Also brokerage. Okay. They do both. Okay. What if the rule was 100% rather than 2.3%? Would that change the case? So the only energy you could supply had to be produced in Michigan, or it had to be produced in Zone 7. If MISO's local cleaner requirement supported 100% individually applied local cleaner requirement, then I would say it doesn't change the analysis whatsoever. It's a neutral requirement based on the limits of import capacity coming into the state. And there is a limit. No one disputes that there's a limit to how much capacity can be and how much energy and capacity can be brought into the state through transmission lines. But Michigan could say 100% of the energy that's used in Zone 7 has to be generated in Michigan. So that clearly discriminates against someone in Toledo or South Bend or Chicago. Well, I guess I was… In answering your question, I was assuming… I admit this is very hard, but… No, it's a good question. In answering your question, I was assuming that the commission's requirement, assuming it's a 100% requirement, was based on MISO's, just like it is today, and that MISO told all electric providers that they need to have all of their power in the state because that's all that the system will support. The LCR incorporates the local clean requirement, incorporates the transmission limit. And so to the extent that there's no ability to import transmission because there's no transmission lines running into the state? I'm missing something. I guess I thought this was a Michigan-generated rule. And you keep mentioning reliance on MISO, and MISO's like quasi-federal, so that… It's a collaborative approach, Your Honor. And the commission used MISO's local clean requirement as a starting point to then apply it to individual electric providers. The 2.3% came from MISO? Well, it's an incremental approach. 2.3% is actually extremely low. The real local clean requirement that MISO establishes is in the 90% range. And so Michigan said, We can't expect alternative electric suppliers to meet a 90% local clean requirement in four years' time. We're going to give them an opportunity to slowly meet this requirement. And so it incrementally phased up. I see the argument you're making now is that we had, like, three buckets. We had Tracy, and then we had the Federal Power Act, or Federal Overlay, and then we have whether there's actual discrimination in facial or in effect. The argument you're making now falls into the third category? It does, certainly. It's relevant to whether or not there's discrimination, because if the requirement were not neutral, if the state were implementing a protectionist requirement, regardless of what the transmission infrastructure will support, then you would have a discrimination problem. But that's not what's happening here. You have a neutral requirement based on. It's not neutral for the electricity producer in West Virginia. Well, Your Honor, it's neutral in the sense that it's based on what the transmission infrastructure will support. And I see that my time is up. It's like a policy justification. So does that just go to strict scrutiny? Does that just go to how we should scrutinize this, and here you have reasons for meeting local power? Well, there are several cases that have evaluated the neutrality of certain state requirements. And the TrueStell... Those are requirements that apply to everyone who's in the state who's doing business there. The same, right? Like the ambulance example or the Kentucky, the case you started with, the Kentucky case. If you're doing business in Kentucky, you have to... Certain certification or something. It's harder for people out of state to do that, but it's too bad. You still have to do it. That's okay. Maybe I can put the DirecTV case as an example. In that case, the court was considering whether or not the state could give cable providers a tax credit for the franchise fees that they were paying to local municipalities. And satellite providers weren't receiving the same benefits, so they filed suit. And the court said that it was treating... It was a neutral requirement, and it was treating cable companies the same as it was treating satellite providers, even though it was only cable companies who qualified for the tax credit. Okay. I think we can hear from your colleague. Thank you, Your Honor. Taylor? Yes, Your Honor. Good morning or afternoon. Good afternoon, Your Honor. And may it please the court, Assistant Attorney General Nicholas Taylor of the Michigan Department of Attorney General Public Service Division on behalf of the defendant commissioners. Your Honors, I intended to focus a good chunk of my time here this afternoon talking about the Tracy decision. That was touched on briefly. But I wanted to first start by touching on a few points in the discrimination bucket. I know Your Honor has pointed out there's several buckets to consider here, so I want to try to be clear when I transition from one to the other. Give some time to Tracy before you sit down, but go ahead. Happily, Your Honor. Thank you. So to judge Radler's question regarding the idea of whether or not an electric producer out of state is the appropriate comparison in this case and whether or not that in and of itself would fall under the traditional idea of a dormant commerce clause case, I just wanted to highlight, first of all, that the burden to show discrimination, right, and that would be the first of what could be thought of as three-part tests under a dormant commerce clause challenge. First, the burden on the challenger is to show that discrimination exists. If it does, it goes to strict scrutiny. And if it doesn't, we go to the pike balancing test. And apologies, I know that's in the brief, so I don't mean to repeat. But I do think it's important to highlight that it is the burden of the challenger to show that discrimination does exist. And the test we know that applies for utility regulations to determine whether or not discrimination exists is whether the challenger can show that, one, in-state entities are benefited and, two, that out-of-state entities are burdened. And we know that from cases like Arkansas Electric Co-op Corp that repudiated a previous bright-line test that distinguished between wholesale and retail distinctions. I would submit that the comparison that's been offered, the economic interests that have been offered for that two-part discrimination test, are alternative electric suppliers and incumbent utilities. Why isn't it the West Virginia Electric Company that can't sell, doesn't have access to 100 percent of the market in Michigan? Your Honor, I would submit that my reading of the record below is that that case was not made by, at least to a sufficient level, to justify those two-pronged tests that we know applies under Arkansas Electric Co-op. How much does it have to be made that the law is pretty clear that you can't buy, you can't have 100 percent of it generated outside of Zone 7? Your Honor, that was the second portion of the question that I wanted to get to. I would distinguish and slightly disagree with that framing of what the Dormant Commerce Clause protects against. I don't think in and of itself the percentages are what are determinative. I think that the Dormant Commerce Clause, just recently in this session, the Supreme Court and National Pork Producers Council noted that the core of the Dormant Commerce Clause is protectionism and anti-out-of-state discrimination.  So throughout the case- Out-of-state pork producers had full access to the market. They just had to adapt certain things to meet California requirements. Absolutely. Here, West Virginia doesn't have access to the full market. Absolutely, Your Honor. And I don't mean to say that the facts of that case. That's simply the notion that underlined- What's your point? What's your point? Sorry. No, no, no. That's quite all right, Your Honor. Apologies if I was unclear. My point is just that the evil that the Dormant Commerce Clause seeks to prevent is economic protectionism for the sake of protecting in-state economic interest. What we have here is a realization and a recognition of the laws of physics that demand that a certain percentage of electricity be produced in-zone to reach the accepted reliability standards that are applicable in this case. And as I think- So those are all justifications for why what you're doing either satisfies Pike or strict scrutiny? I actually think that- Sorry, Your Honor. I'm sort of talking a lot. I think that the two-part test is the avenue by which we get to the real question, right? And the Supreme Court has recently talked about how it's a bit more of a continuum than the distinct buckets that we might think of the Dormant Commerce Clause traditionally. So to answer your question, it may have implications throughout because at the core what we need to focus on is, is this a matter of a state directing economic- It's a 100 percent example. But if Michigan's regulation was 100 percent of your energy has to be available through Michigan or through Zone 7, I would submit that under the idea- That could very well not be a protectionist law under the fact that- I mean, wouldn't it depend on the physics? I mean, Michigan's an interesting example because if you said all of the power in the upper peninsula has to be produced within the upper peninsula, that would look pretty reasonable as opposed to all the power in Detroit has to be produced in Detroit and not in Toledo. Absolutely, Your Honor. And I think that- And my point about the protectionism is that there is a distinction in the case law between actions that are- that the root evil that the Dormant Commerce Clause seeks to root out is not certain thresholds or certain treatments of in-state and out-of-state interests. The Supreme Court, and also in the Pork Producers case, recognized that nearly every state law has ripples that affect the interstate commerce. They don't bar- They don't bar access to some percentage of the market, do they? Is this different than the Texas case, the Fifth Circuit case? I do think it's different than the Fifth Circuit case in that the Fifth Circuit case was- the court described that as a complete ban from out-of-state- or non-incumbent entrants, including out-of-state entrants, from coming in and participating in the transmission market within the state. In this case, there's nothing in the local clearing requirement that prevents any provider of electricity to companies, a load-serving entity, from coming into the state and providing the service. I understand your point, Judge Radler, about out-of-state electric generators. That may or may not be burdened by this regulation. I would submit that that is not the challenge that's- the record doesn't substantiate that challenge. Am I right that the incumbent utilities could buy power from out-of-state generation if consumers' energy says, gee, there's this nice, cheap power plant across the border in Ohio. Let's buy it and use it to serve our load. They could do that as long as they didn't violate the in-state- the in-zone requirement just the same as the AESs. Is that correct? That is correct, Your Honor. And I think it brings us back to the actual comparison that was put forth in this case, which is alternative electric suppliers versus incumbent utilities. And I want to be mindful of your request, Judge Boggs. We'll give you time, I promise. Okay. Can you keep going on this point? Okay. So the point, right, is that- well, I do think they dovetail within each other, right, and that, yes, the local clearing requirement, this is the idea that it's universally applied to all types of load-serving entities, right? So that is correct, that an incumbent utility could, you know, subject to its regulation, right? And there are other portions, and that's kind of inherent in the Tracy discussion, that incumbent utilities are subject to different regulations and different processes. So there are state processes that would probably dictate how that capacity and generation occurred. And that's one of the distinctions that so closely aligns with the situation that we had in Tracy. And- Can I just go back to- Absolutely. If we had a West Virginia plaintiff, if we had an Ohio plaintiff who produced energy and said is also part of this case and said, I want to produce, I want to sell to 100% of the Michigan market and only for Zone 7 and only 98, 97.7% is available, whatever the percentage is, would that change the case? Is this your point, that this Ohio or West Virginia energy producer isn't part of the case, so we don't have to think about their interests, whether they're being, whether this law is facially discriminatory or discriminatory, facially discriminatory against them? I would submit that if that was the economic interest being presented in the two-prong approach to discrimination that we know applies, then that would be the groundwork from which we'd have to build, that the challenger would have to build both the in-state, the state economic interest or burden and the in-state economic interests are benefited, and that that simply hasn't been shown in this case. Do you want to go to Tracy? Well, yeah, with respect to Tracy, I mean, do you rest upon the argument or make the argument that what isn't for what or shouldn't be what, it should be what, is not the same because of the obligations that you have? Is that your argument, or what is your argument on the Tracy point? Absolutely, Your Honor. That is part of the argument. The argument, really, if boiled down to its core, is that we are in virtually as close to a scenario when we're comparing alternative electric suppliers and incumbent electric utilities, we're about as close to the comparison of independent gas marketers and incumbent gas utilities as we could get, save for the underlying commodity at issue. And Bain Energy Michigan point out that the underlying commodity is electricity, and the district court judge found that, and we don't dispute any of the factual findings that Judge Lawson made in connection to the Tracy determination, simply the application of Tracy, because in Tracy, all providers provided the same commodity as well. They provided natural gas. What distinguished them was the bundled versus unbundled nature that natural gas, incumbent utilities, and alternative providers, independent marketers of natural gas provided. And surely there are differences between natural gas and electricity, but we are talking about bundled providers of electricity. Could you answer the question I asked your colleague about what happens on the ground if you end up winning and Michigan goes ahead with its requirement? What do they have to do that they're not doing now or that they don't want to do if you win? Your Honor, as you pointed out, the requirement has stayed. So assuming that the commission re-implemented the requirement in the exact same way that it did before, I can't speak to that because the commission speaks through its orders, and I can't say here today what that remaining order would be, right? But assuming that it was implemented in the exact same way with the same timeline, the underlying regulation that's being challenged recognized the time aspect of this regulation. The whole point is to ensure adequate capacity inside. So inside the state of apologies for jumping ahead. So the point would be that through the incremental approach, which gives sufficient time for all providers to meet the incremental need of capacity that would be implemented. Does that answer your question, Your Honor? I don't think it does. No, it doesn't come close. Let me try again. Does that mean that they would have to build or buy capacity in the state of Michigan? So they would have to meet the local clearing requirement. Those are options by which they could meet the local clearing requirement. If they are not permitted to, I know it was mentioned that they are effectively barred from the state. That's not the case. If a load serving entity fails to meet its local clearing requirement, it's required to pay an SRM charge, or the customer actually is required to pay an SRM charge to account for the lack of local. So you're saying they wouldn't have to provide in-state capacity, period, they would just have to pay an economic penalty? No, Your Honor, that's not what I'm saying. The intent of the regulation is that they would acquire in-state capacity because that's the goal. That's what the commission wants is most of the capacity of the reliability to come from in-state, but I'm just trying to figure out are they saying we don't have any in-state and we don't want to get any in-state and, therefore, the requirement will burden us? I do believe that's the contention. I think that the commission not only wants it to be in-state, it's recognizing the physical reality that it needs to be in Michigan, and the reason that it should be imposed on all entities, not on an aggregate basis, is because customers of those entities are the ones who are paying for the in-zone. Am I right that, I mean, in effect, at least in principle, it is a requirement against your incumbent utilities as well if they wanted to get frisky and say, oh, we can make a lot more money if we bought an out-of-state power plant. You wouldn't be able to if you transgressed the requirement. It would be all load-serving providers, whether incumbent utility, alternative electric supplier, any other sort, would be subject to the local clearing requirement at the same time. All right. Thank you very much for that. Strict scrutiny? Who did the district court put the burden on to demonstrate, to satisfy the strict scrutiny standard? As we noted in the brief, I think that, in fact, the court didn't apply strict scrutiny, right, because the court found that discrimination wasn't found. It did note that- If you thought strict scrutiny applied, we should remand that because there's no findings on that. I think that the district court found that the defendants did satisfy strict scrutiny, and I think that the record below, which includes the commission- But you just said that- Correct. You're saying the district court said it wasn't required, but as a belt and suspenders, if it was required, it was met? I apologize. Okay. The district court did not apply strict scrutiny. That is correct, but it said that if it had needed to, that it would have found that the defendants had satisfied the requirement. Okay, but did it just fault the plaintiffs for not demonstrating other possible solutions, or did it actually have the state of Michigan show why it couldn't- why it had to ensure that some percentage that grows over time of energy has to be available in the state? I would submit that the district court applied the strict scrutiny test. It certainly did evaluate alternatives that were raised by the alternative party- or the alternative electrics- Excuse me. By Energy Michigan and ABATE, but that doesn't mean that it didn't find that the defendants satisfied their burden under the requirement, because the burden is to show that it serves legitimate local purposes in the least- Your burden. If we were in strict scrutiny, that would be your burden. And I would submit that we did satisfy that burden. Thank you for the time. Thank you very much. Thank you. Good afternoon, and may it please the court. Brian Doyle on behalf of Appellant Energy Michigan. I've reserved five minutes of rebuttal, and I intend to really hit Tracy. That was my intention, but I want to make some introductory comments about who my client is, because I think that will answer some questions that have been raised. My client is an association of AESs. Those are-and the record, Judge Redler, is undisputed in this fact. My client represents companies that own generation, are affiliated with generation out-of-state. My clients buy-they're companies that buy power out-of-state and resell it in Michigan. And energy law is complicated. I was nervous to draw Judge Boggs. I'm not an industry expert, but this- I was nervous to sit with him, so we're all in the same boat. This is not complicated. This is undisputed. If the stay is lifted, my clients, who right now have unfettered ability to generate electricity out-of-state and sell it in Michigan or buy electricity out-of-state and resell it in Michigan, they will be limited on the amount of which they can do that. If the stay is- The amount, but not limited to zero. I mean, I guess the question I had asked earlier was kind of realistically, and the answer I got sounded like, oh, we couldn't possibly do it, as opposed to, well, we can't do as much as we want, which is fair. I think it would be a 2% limit to start. Of course, any discrimination is too much discrimination. De minimis discrimination is too much. But the record below says that 2% starting buy or build- It's a buy or build requirement. It is that simple. It's a 2% buy or build in Michigan requirement to start. The record below is- 2% of all the capacity you have. Okay, so if you say we want to provide 1,000 megawatts, you'd have to provide 20 megawatts in Michigan, and then it might be 30 or 50 or 70. Is that fair? That's correct. Okay. That's correct, Your Honor. If you want to do business in Michigan, if the stay is lifted, you've got to at least buy 2% or build in Michigan to supply 2%. Right now, are you, in fact, supplying a good bit of energy? Collectively, our organization is, but they're doing it through out-of-state sources. They're buying it in Ohio and reselling it in Michigan. They're generating it in Ohio. Are you doing what you're doing out-of-state? I mean, there's no reason some of it couldn't be in-state, right? No. Put a windmill in Lake Michigan. There's a practical reason, which is we don't get a guaranteed 10% rate of return when we build a windmill, right? I mean, that's a very practical. The buy in Michigan. You're an independent producer who also doesn't have the public utility obligation. That's fair. The buy in Michigan supports Michigan. The build in Michigan supports Michigan. Both of those burden and discriminate against out-of-state. It's a buy or build local. It is that simple, and it starts at 2.3%. You'll see in the record it's undisputed. It's meant to go close to 100%. That is the goal. That's what will happen. There was debate below. How quickly will it get to 95%? How quickly will it get to 50%? There's no debate below that it will escalate dramatically to a full load ratio. If you're doing a word search, that's what you look for in the record. Full load ratio means that 2.3% will shoot up. It's designed to shoot up, and it will over time. Because they assume load growth, that is the reason I ask it that way, is that the underlying justification in a sense here is grid reliability. So if the grid is relatively reliable at 2.3% or 4%, why would you conceivably need it to go to 100%? I'm a little bit out of my lane answering that question, but I think you're exactly right. They don't include new additions, and so that's why it increases. That's my understanding as a layperson. It could be that this case would be different if it were 100%. So what you were really doing was evicting 1,000 megawatts of outside and replacing it. If consumers really were saying, hey, we really want to build a new plant and get 10%, and we want to evict these interlopers, that might be a different case. That's not the case, though, because the new generation is not counted, and that's why we say it artificially increases from 2.3%. We had a real problem with that at the regulatory level, and we argued that below. But that does show you why the full load ratio goes up, because new generation, as old generation comes offline, new generation is not counted as I understand it, Your Honor. So I do think the discriminatory aspect of the case, thankfully, is that simple. It's a buyer-billed local. That's what will happen if the stay is lifted. Now, Tracy, I think my friends on the other side would say, well, Tracy insulates us from discriminatory conduct. I think that's one of their main arguments. And, of course, I think this court has a way out of that, just like the district court judge did, which is to say we don't need to address the threshold issue in Tracy because we're not dealing with competing entities that provide different products. They provide the same products. Now, my friends say – How is that different from Tracy? Gas is gas in the same way that a watt-hour is a watt-hour, isn't it? There's some key distinctions from Tracy, and it's important that I talk about them. Yeah, I'd like to hear it. So the question the court wrestled with in Tracy, there were two markets in Tracy, the captive market and the competitive market. And the Supreme Court said we can either cover this eye and view this case as just the captive market, in which case we don't have competition, or we can cover this eye and it will be a competitive market and we do have competition. And the court said there's no guidance. There's no standards for doing that. We have to decide on the fly which market they said should we give controlling significance to. And there were two reasons why they gave controlling significance to the captive market, and that's why they found that there were different products. Number one, Tracy – this couldn't be more key. Tracy did not involve interstate commerce. Tracy was a case involving retail sales intrastate. This case here involves interstate commerce. And that is baked into the Tracy decision at 290. Before the court got into the facts at all in Tracy, the court said, we recognize that states have the ability to regulate as a matter of local concern direct intrastate sales. This is what the court in Tracy then said. At the same time, the dormant commerce clause prevents states from regulating interstate transportation or sales. So that's a key, key distinction between this case and Tracy. Tracy was retail, local, intrastate sales. This case is wholesale. I thought the marketers tended to purchase out-of-state natural gas. They were both selling to customers in Michigan, which is the case here. You're both selling to customers in Ohio with the gas, Michigan here. That's true, Your Honor, but Tracy didn't put a wall up at the border. That's the difference here. Tracy was involved at the retail level. It didn't have anything to do with where the gas could come from. It didn't put a barrier up at the state border. It was a retail. So you're saying that it was, but again, help me if I'm wrong. Please. That the marketers, the independents I'll call them, were tending to buy out-of-state. So you did have a different regime that affected people who were essentially out-of-staters versus here. I don't know that. I'm not prepared to answer that because I don't know that. I don't know the record in Tracy whether they were primarily buying out-of-state or in-state. I don't know that. What I do know is that it was an intrastate case involving retail, the reliability of retail sales, versus this interstate case involving how can you restrict energy from coming outside of Michigan. So that was a key distinction. The second was the status quo. The Tracy court, and this was the primary concern of the Tracy court, the regulation in place that benefited the incumbent utilities had been in place for 60 years. And the Supreme Court said we don't know what will happen if we take away that benefit from these incumbent utilities. Will it cause a reliability concern? We don't know that. This flips Tracy on its head. In this case, the status quo is the Michigan legislature, through blood, sweat, and tears, carved out 10% of the market for free competition. The state commission is coming in to disrupt the status quo. This court should have the same concerns as the court had in Tracy. This court, I respectfully should say, we don't know what will happen if we allow the state to interfere with free competition by putting in these restraints. We're not equipped. Okay, thank you. I appreciate it. Thank you, Your Honor. We have an excellent argued case all around, and the case will be submitted.